UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DONITA S. JOHNSON, | ) |
|   Plaintiff, | ) ) ) |
| vs. | ) CAUSE NO. 1:12-cv-25-WTL-TAB ) |
| ERIC K. SHINSEKI, SECRETARY OF VETERANS AFFAIRS, | ) ) ) |
|   Defendant. | ) ) |

### ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment. The Plaintiff has not filed a response to the motion, and the time for doing so has expired. The Court, being duly advised, **GRANTS** the Defendant's motion for the reasons set forth below.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court must view "the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

Because the Plaintiff failed to respond to the Defendant's motion for summary judgment, the facts asserted by the Defendant in its motion are deemed admitted by the Plaintiff to the extent that they are supported by evidence in the record. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (citations omitted). "However, a nonmovant's failure to respond to a summary judgment motion . . . does not, of course, automatically result in judgment for the movant." *Id.* (citations omitted). Rather, the Defendant must still demonstrate that it is entitled to judgment as a matter of law. *See id.*

## II.  UNDISPUTED FACTS OF RECORD

The following facts are asserted by the Defendant and supported by the evidence of record.

### A.  Johnson's Employment

In 1997, Johnson received a career-conditional position at the Richard L. Roudebush VA Medical Center in Indianapolis, Indiana ("the Medical Center").  The Medical Center has five primary care clinics, designated as Blue, Red, Gold, Orange, and Green Clinics, that offer a wide array of services to veterans, including cancer screening, smoking cessation, vaccinations, and treatment for high cholesterol, chronic obstructive pulmonary disease, diabetes, high blood pressure, obesity, osteoporosis, and prostate disease.  The primary care clinics are staffed with registered nurses, licensed practical nurses, health technicians, and medical support assistants.

In 2009, Johnson was employed as a GS-5 medical support assistant (also called a patient services assistant). Medical support assistants perform clerical functions such as greeting patients, answering phones, checking in patients, confirming demographic information and obtaining insurance information.  Johnson was one of two medical support assistants assigned to check in each of the approximately 300 patients per day at the central check-in point for the five

primary care clinics. As an ancillary duty, Johnson also entered lab orders into the computer. Her scheduled hours of work were from 8:00 a.m. to 4:30 p.m. Johnson's presence at her duty station was an essential function of her position. When Johnson was absent, her patient check-in responsibilities had to be reassigned to other staff, who were then unable to perform their own assigned duties.

Johnson's supervisor was Lisa McNeal, whose title was supervisory health technician. McNeal and her supervisor, Donna Chasteen, whose title was Unit Manager for Ambulatory Care and Primary Care, worked together to ensure that the primary care clinics at the Medical Center were adequately staffed. Chasteen was primarily responsible for the registered and licensed practical nurses and McNeal was primarily responsible for the health technicians and medical support assistants. McNeal was responsible for approving leave for the health technicians, medical support assistants, and registered and licensed practical nurses within the primary care clinics. McNeal monitored the leave usage of her employees, administered verbal and written counseling, and placed employees on sick leave restriction when appropriate. She could not terminate an employee's employment.

## B. Johnson's Walking Limitation

In 2005, Johnson underwent arthroscopic surgery on her knee, which she had injured on the job. Although her doctor told her she needed to have knee replacement surgery, because neither worker's compensation nor her health insurance would pay for it she could not afford to have it done. As a result of her knee problem, Johnson experiences difficulty standing for long periods of time and walking long distances. The worker's compensation doctor restricted Johnson to walking no more than 400 feet at a time, although Johnson felt like she was able to walk farther than that, at least on some days.

3

Because of her walking restriction, Johnson was given an assigned parking space and a wheelchair was kept in the parking garage for her to use to walk behind to get to her work station, which was near the elevator to the parking garage. She was also given a foot stool and something to make her computer higher. Johnson did not believe there was any other accommodation that she needed to perform her job duties.

### C. Johnson's Disciplinary Record

During her tenure at the Medical Center, Johnson was disciplined several times. First, in July 2000, Johnson received a reprimand for disrespectful conduct in the presence of a patient and improperly extending her break. Her supervisor at that time was someone named Jackie.

In January 2002, Johnson received a three-day suspension for three counts of unexcused or unauthorized absences within a month. Her supervisor at that time was Cheryl Proper.

In March 2002, Johnson was suspended for seven days for rude and disrespectful conduct toward a supervisor and disrespectful conduct in a patient care area. Ms. Proper was still her supervisor at that time.

In April 2007, Johnson received a 14-day suspension in lieu of removal for providing false documentation in connection with attendance at work and unexcused or unauthorized absences. Johnson admits that she provided a falsified medical document. Chasteen was Johnson's supervisor at that time. Medical Center Director Susan Bowers made the decision to reduce the removal to a 14-day suspension and place Johnson on sick leave restrictions for a year.

### D.  The Medical Center's Leave Policy

Medical Center Memorandum 05-01, Absence and Leave, outlines the Medical Center's policy regarding leave (the "Leave Policy"). The failure to follow proper leave procedures may result in disciplinary action.

Pursuant to the Leave Policy, "annual leave" is an authorized absence from duty.  It should be requested in advance and requests are considered in regard to current and anticipated workloads. "Sick leave" must be granted upon the proper request of an employee if the employee is incapacitated for the performance of duties; if his or her presence at work would jeopardize the health of others due to exposure to a communicable disease; or if an absence is necessary to receive medical treatment, provide for a family member with an illness, make arrangements for the death of a family member or attends that member's funeral, or for purposes related to adopting a child.  Employees are responsible for notifying their supervisors as soon as practical after it becomes apparent that they will be absent because of illness.  An employee is required to speak to a supervisor and not leave a message.  Periods of illness for more than three work days requires provider documentation.  "LWOP" is a temporary absence from duty in a non-pay status at the employee's request.  LWOP is granted at management's discretion and is not a matter of right except for certain disabled veterans, Reservists and National Guardsmen, or for qualifying employees requesting leave under the Family and Medical Leave Act ("FMLA").  LWOP is ordinarily granted only for reasons that are considered to be in the best interest of the Medical Center, which may include education, recovery from temporary illness, protection of the employee's status while personnel actions are pending, during pendency of the final action by the Office of Worker's Compensation, or for adjudication of disability retirement benefits. "AWOL" is unauthorized absence from duty and may be a cause for disciplinary action.  AWOL

charges are documented on time and attendance reports and employees are informed of AWOL charges.

Employees ordinarily request leave by inputting their request into the computer. Questions regarding the granting of leave are referred to supervisors or personnel in the Human Resource Management Services Department. Questions regarding the recording of leave accounts and pay are referred to the payroll department.

### E.  Events Leading to the Termination of Johnson's Employment

In October 2009, some of Johnson's co-workers complained to McNeal about Johnson's frequent absences.  At that time, Johnson earned six hours of annual leave and four hours of sick leave for each pay period. Johnson could view her current leave balances in the time and leave computer system.  The time and leave computer system was updated every two weeks when time cards were finalized and sent for payment processing.  In addition, McNeal was available to answer leave questions, as were the timekeepers and human resources personnel.

In response to Johnson's co-workers' complaints, McNeal met with Elizabeth Oliver-Alson, who was an Employee and Labor Relations Specialist in the Human Resource Management Services Department, concerning Johnson's attendance.  Oliver-Alson's duties included assisting managers in dealing with employee performance and conduct issues.  As a result of the discussion, Oliver-Alson performed an audit of Johnson's leave from January 1, 2009, through October 30, 2009, and provided the results to McNeal.  The audit revealed that Johnson had been absent from work 709-1/2 hours during that time period, with 560-1/2 hours being LWOP.  In essence, Johnson failed to work approximately 47% of her work schedule. Johnson's absences were based on numerous circumstances, including her own illnesses, traffic problems, car trouble, and family illnesses.  This degree of absenteeism was unacceptable, as

Johnson's presence was necessary to the smooth running of the clinics and her excessive unscheduled absences caused hardship to her co-workers.

Oliver-Alson instructed McNeal to provide notice to Johnson of her leave usage and that LWOP would not be granted for future absences if Johnson did not have sufficient leave to cover her absences. Oliver-Alson prepared a notice memorandum, dated November 4, 2009, for McNeal's review and signature. The notice memorandum encouraged Johnson to manage her leave balances and notified her that failure to have appropriate leave to cover her absences, even if medical documentation was provided, could result in a charge of AWOL that could be the basis for disciplinary action up to and including removal. The memorandum notified Johnson that as of November 4, 2009, she only had six hours of annual leave and four hours of sick leave.

On November 9, 2009, McNeal met with Johnson and her union representative and presented her with the November 4, 2009, memorandum. While Johnson refused to sign the notice, she does not dispute the accuracy of the information in it.

On December 27, 2009, Johnson fell at home. She went to the doctor on December 28, 2009, and a CT scan was scheduled for the evening of December 29, 2009. Johnson was scheduled to work on December 29, 2009. She called the nursing supervisor, Deborah Moore, at 5:53 a.m. and requested sick leave to cover her absence from duty that day. Johnson told Ms. Moore that she had sufficient sick leave to cover her absence, but Johnson actually had only five hours and 45 minutes of sick leave. Johnson was charged AWOL for 2:15 p.m. to 4:30 p.m. on December 29th. Due to an equipment problem, her CT scan was cancelled; Johnson was told that it would be the following evening before it could be rescheduled.

Johnson was scheduled to work on December 30, 2009, from 8:00 a.m. to 4:30 p.m. She called the Medical Center at 6:40 a.m. and spoke with Moore again. She told Moore that she

7

would be two hours late because her car doors were frozen shut and requested annual. Johnson then heard from the hospital that her CT scan could be done that morning instead of that evening. Johnson then called the Medical Center and spoke with Timothy Spaulding, Unit Manager Phlebotomy & Specialty Clinics. She explained that she had a doctor's appointment and needed the entire day off. Johnson did not have sufficient sick leave to cover her absence on December 30, 2009, and she was charged AWOL for 8:00 a.m. to 4:30 p.m.

Johnson had the CT scan done the morning of December 30th and returned home to await the results. Johnson's doctor called and told her that she could return to work as the CT was negative.

Johnson was not originally scheduled to work on December 31, 2009, but because she knew she had no leave left, she called her supervisor the night before and left her a message indicating that she would be at work that day. She called Moore at 6:43 a.m. that morning to say that she would be 30 minutes late and requested annual leave to cover that time. Johnson did not have sufficient leave to cover her absence and she was charged with AWOL for 8:00 to 8:30 a.m.

On January 5, 2010 at 8:06 a.m., McNeal notified Johnson via e-mail that her absences on December 29, 30, and 31 were charged as AWOL because she did not have sufficient leave to cover her them. She also informed Johnson that AWOL was an unapproved leave status that could be the basis for disciplinary action up to and including removal from federal service. Johnson responded at 9:25 a.m. stating that she thought she had leave based on the "last leave balance."

Johnson was scheduled to work on January 11, 2010, from 8:00 a.m. to 4:30 p.m. Johnson contacted the nursing supervisor, Edna Tolbert, at 6:25 a.m. requesting sick leave.

8

Johnson told Tolbert that she had enough sick leave to cover her absence; however Johnson had accrued only 5 hours and 45 minutes of sick leave.  On January 19, 2010, McNeal notified Johnson via e-mail that she had been AWOL on January 11, 2010, because she had insufficient leave to cover her absence.

McNeal notified Oliver-Alson that Johnson had been AWOL for 10-1/2 hours for her absences on December 29, 30, 31, 2009, and January 11, 2010.  Johnson had not requested FMLA, and Human Resources did not have a current FMLA approval on file for her. Oliver-Alson confirmed that the AWOL charges were appropriate since Johnson did not have sufficient leave to cover her absences. Oliver-Alson reviewed Johnson's past disciplinary actions and advised McNeal that recommending Johnson's removal from her employment was reasonable based on the current AWOL charges and her history of suspensions and that removal would be consistent with the recommended action from the Table of Penalties in VHA Handbook 5021.

McNeal next discussed the situation with Dr. Christopher Suelzer, Associate Chief of Staff for Ambulatory Care, who was Johnson's Service Chief.  She provided Suelzer with Johnson's leave use summary for January 1, 2009, through October 30 2009, the November 4, 2009, memo, and Johnson's recent AWOL charges. Oliver-Alson also conferred with Suelzer. She advised him that proposing Johnson's removal was reasonable based on the current AWOL charges and her history of three suspensions and that it was consistent with the recommended action from the Table of Penalties in VHA Handbook 5021.  Based upon his experience in handling other instances of similar behavior, his review of the evidence, and his discussion with Oliver-Alson, Suelzer made the decision to recommend Johnson's termination.  This was accomplished by a Notice of Proposed Removal, which was drafted by Oliver-Alson.

The Notice of Proposed Removal, dated January 22, 2010, informed Johnson that her removal was being proposed based upon the four incidents of AWOL in December 2009 and January 2010. The Notice also noted that her past disciplinary history would be taken into account in determining the proper disciplinary action. The Notice also informed Johnson of her right to reply to the proposed removal within seven days from her receipt of the notice.

On January 29, 2010, Suelzer met with Johnson and her representative and gave her the Notice of Proposed Removal.

### E.  The Decision to Terminate Johnson's Employment

All final decisions regarding terminations of hospital employees are made by the Medical Center Director, Thomas Mattice.  Mattice met with Johnson, her union representative, and Oliver-Alson on February 26, 2010, to discuss the proposed removal.  Oliver-Alson assembled an evidence file that contained evidence to support the proposed removal and evidence of Johnson's prior discipline.

Johnson brought with her to the meeting a list of "Points to Make to Mr. Mattice." Johnson told Mattice about issues with her personal life and health problems that she was having. She informed him that she knew her attendance at work had been "horrible" because of those issues.  She told him that she enjoyed working at the Medical Center and wanted to continue working there.  Johnson told Mattice that she would do better and not have these incidents in the future.

Johnson also provided two written responses to the proposed removal on February 9 and 26, 2010.  In her February 9, 2010, response, Johnson apologized for the hardship her absenteeism has caused her clinic and her team. She outlined the events of December 27 through 31, 2009.  She said that her absences were due to a fall on December 27, 2009, and the

10

subsequent medical care she received. Johnson admitted that her absences created a hardship on the facility and acknowledged that it didn't matter "how good a worker I am" if she was not at work. Johnson discussed her personal life, including her mother's illnesses in 2006 and 2007, her brother's diagnosis in 2009, and her own need for surgery in 2008. In Johnson's second written response, she admitted that her attendance record had been "horrible" and apologized for the burden her absences had placed on her coworkers.

Mattice reviewed the evidence file prepared by Oliver-Alson, Johnson's written responses, and the information Johnson provided in her oral response. The evidence file indicated that Johnson had been absent from duty 709-1/2 hours from January 1, 2009, through October 30, 2009. He noted that a significant portion of those hours, specifically 560-1/2 hours, were denominated LWOP. He also noted that Johnson had been notified on November 4, 2009, of her leave balances and that she would not be granted LWOP if she failed to have enough leave to cover her absences. He saw that Johnson had been encouraged to manage her leave balances and was informed that failure to have appropriate leave to cover her absences from duty, even if she provided medical documentation excusing her from duty, could result in her being carried as AWOL. He also noted that she had been reminded of the requirements for applying for leave under the FMLA. Mattice also considered the Douglas Factors[1] and, although he thought that there were some mitigating circumstances related to her personal life, he determined that the aggravating factors of the severity of the offense, the frequency of the offenses, her previous discipline, the clarity with which she was put on notice of her expectations, and her potential for rehabilitation overcame the mitigating circumstances. Ultimately, Mattice made the decision that

---

[1]The Douglas Factors are twelve factors that should be considered by a federal agency in determining the appropriateness of an employee's disciplinary penalty. *See Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981).

removal was appropriate. On March 11, 2010, Johnson was notified that her employment would be terminated.

### III. DISCUSSION

Johnson's amended complaint[2] asserts four claims:  Count One—Sex Discrimination in Violation of Title VII; Count Two—Age Discrimination in Violation of the ADEA; Count Three—Disability Discrimination in Violation of the Rehabilitation Act; and Count Four—Disability Discrimination (Failure to Accommodate) in Violation of the Rehabilitation Act.  The Defendant moves for summary judgment on all of Johnson's claims.

#### A.  Discrimination Claims

As set forth above, Johnson asserts claims for sex, age, and disability discrimination in her amended complaint.[3]  However, as the Defendant notes in its motion, when asked in her deposition to explain the bases on which she believed she was discriminated against, Johnson stated that she was treated differently because of her age, her disability, and her race; she did not mention her gender.  The Defendant addresses all four possible types of discrimination in its motion.

Because the Court is not aware of any direct evidence of discrimination against Johnson based upon race, sex, age, or disability, it is appropriate to employ the *McDonnell Douglas* burden-shifting analysis to Johnson's discrimination claims to determine whether the Defendant is entitled to summary judgment.  *See Keeton,* 667 F.3d at 884 (reviewing unopposed motion for summary judgment in discrimination case).

---

[2] Johnson's amended complaint (Dkt. No. 18) is incorrectly titled Second Amended Complaint and Demand for Jury Trial.  Because she was denied leave to file the amended complaint she originally proposed, the "Second Amended Complaint" is actually her first amended complaint.

[3] In her deposition Johnson testified that she believed McNeal discriminated against her because she "wasn't an ethnic group," i.e., because she is white.

12

> Under the burden-shifting analysis, a plaintiff must first establish a prima facie case of discrimination by demonstrating that (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment. If the plaintiff establishes a prima facie case of discrimination, the burden then shifts to the employer to offer a non-discriminatory reason for the adverse employment action. If the employer does so, the burden shifts back to the plaintiff to submit evidence demonstrating that the employer's explanation is a pretext.

*Id.* at 884 (citations omitted).[4]

"Although the question of pretext normally arises only after the plaintiff has established a prima facie case of discrimination and the employer has countered with a legitimate non-discriminatory reason for the adverse action," the Court will follow the lead of the *Keeton* decision and "skip over the initial burden-shifting of the indirect method and focus on the question of pretext." *Id.* at 885. The Defendant has presented evidence that it terminated Johnson's employment for legitimate, non-discriminatory reasons; namely, the fact that she been AWOL several times after being clearly warned, in writing, that doing so could result in her termination, along with her otherwise dismal attendance record and her disciplinary history. To demonstrate pretext, a plaintiff must show that her employer did not honestly believe in the reasons it gave for the action it took. *Id.* at 885. Here, Johnson has not directed the Court to any evidence that the Defendant's explanation was a pretext for sex, disability, age, or race

---

[4] With regard to Johnson's disability discrimination claim, "[t]o establish a prima facie case under the Rehabilitation Act, [she] must prove that she (1) falls within the ADA's statutory definition of 'disabled,' meaning that she has a 'physical or mental impairment that substantially limits a major life activity, a record of such impairment, or [is] regarded as having such impairment,' *see* 42 U.S.C. § 12102(2); (2) is otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) has suffered an adverse employment decision because of the disability." *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008). The burden-shifting approach that applies to other types of discrimination cases also may be applied to disability discrimination cases. *Dyrek v. Garvey*, 334 F.3d 590, 598 (7th Cir. 2003).

discrimination, and the Court is not otherwise aware of any such evidence. Accordingly, Johnson's discrimination claims fail as a matter of law.

## B. Failure to Accommodate Claim

In her amended complaint, Johnson alleges that the Defendant violated the Rehabilitation Act because it "refused to provide [her] with a reasonable accommodation for her disability." Amended Complaint at ¶ 47. The complaint does not indicate what the accommodation was that she was not provided. In her deposition, Johnson identified her disability as her knee problems and testified unequivocally that she did not request any accommodations beyond those that she had because "I had what I needed. I had my wheelchair, I had the footstool and the little thing to make my computer higher and my parking spot when it was available."[5] Johnson Dep. at 154. Johnson therefore has failed to articulate a claim for failure to accommodate, and the Defendant is entitled to summary judgment on that claim.

## C. Additional Claims

In addition to the claims expressly asserted in Johnson's amended complaint, the Defendant addresses two other claims that it believes Johnson has asserted.

First, defense counsel asked Johnson at her deposition whether she was making a claim under the FMLA. Johnson answered that she believed that some of her absences should have been counted as FMLA leave and they were not. However, as Johnson acknowledged in response to the Defendant's motion to dismiss, the FMLA does not provide a private right of action for federal employees. Johnson therefore amended her complaint to remove that claim. Other than the Defendant's questions about it during Johnson's deposition, and there is no

---

[5] Johnson testified that despite the fact that her reserved parking space was marked "security only," sometimes people would park there. She does not allege that the Defendant failed to take reasonable measures to provide her with a reserved space.

suggestion that she wishes to resurrect her FMLA claim. Rather, while Johnson may believe some of her leave was mislabeled, she does not, because she admittedly cannot, assert a claim under the FMLA.

The Defendant further argues that "Johnson also claims that she was subjected to a hostile work environment in that she was charged with being AWOL on January 27, 2009, February 1 and 10, June 8, September 17, 21, and 29, 2009, when she should have been provided LWOP and was required to produce documentation for her absences because of her race, disability, and age. (Dkt. 18, ¶ ¶ 24-26). The cited paragraphs from Johnson's amended complaint read as follow:

> 24. On January 27, 2009, McNiel [sic.] denied a request from Johnson for Leave Without Pay ("LWOP"), and charged Johnson with being absent without leave ("AWOL").
>
> 25. On February 1 and 10; June 8; September 17, 21 and 29 Johnson was again charged as being AWOL.
>
> 26. In addition, throughout the period when Johnson was requesting sick and/or FMLA leave, McNiel [sic.] repeatedly marked Johnson as being AWOL when she was not. Although McNiel [sic.] usually corrected these charges, she did not do so for a considerable period of time after the original charges, with the result that Johnson could not determine at any particular time what her leave balances were.

These paragraphs do not assert a hostile work environment claim; nor does the remainder of the amended complaint or those portions of Johnson's deposition testimony that are in the record. Johnson asserts that her supervisors mistreated her with regard to the way in which her absences were counted, but this is quite different from asserting that they created a hostile work environment—that is, work environment that was "both objectively and subjectively offensive." *See, e.g., Passananti v. Cook County*, 689 F.3d 655, 665 (7th Cir. 2012). Accordingly, there is no hostile work environment claim for the Court to address.

## IV.  CONCLUSION

15

For the reasons set forth above, the Defendant's motion for summary judgment is **GRANTED** as to all claims asserted by the Plaintiff.

SO ORDERED: 05/10/2013

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification